# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> RICHARD J. RANDOLPH, III ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. <br> 1:21-cv-1321-SDG |

## PLAINTIFF SEC'S MEMORANDUM OF LAW SUPPORTING ITS MOTION FOR FINAL JUDGMENT

Plaintiff Securities and Exchange Commission ("Commission") submits this Memorandum of Law Supporting its Motion for Final Judgment with respect to Defendant Richard J. Randolph ("Randolph"). Specifically, the Commission respectfully asks the Court to enter a Final Judgment that: renews the injunctive relief previously ordered and orders Randolph to pay disgorgement of $1,110,260.86, plus prejudgment interest of $175,248.40, for a total of $1,285,509.26, but deeming that obligation satisfied by the restitution order of $1,602,200 entered against Randolph in the parallel criminal case styled *United States v. Randolph*, No. 1:21-cr-00118-SDG (N.D. Ga.).

This Motion follows the Court's Judgment as to Randolph [Dkt. No. 7], which was a partial judgment that imposed injunctive relief while also establishing

that Randolph would be ordered to pay disgorgement, prejudgment interest and a civil penalty, but leaving the amounts of each to be determined "upon motion by the Commission." [Dkt. No. 7, ¶ V]. In connection with such motion, Randolph agreed that the allegations in the complaint "shall be accepted as and deemed true by the Court" and that he could not dispute that he violated the federal securities laws as alleged in the complaint. [*Id.; see also* Dkt. No. 5-1 at 3]. In accordance with that language, the Commission hereby moves the Court to determine those amounts.

## BACKGROUND

Between approximately 2016 and 2021, Randolph raised more than $1.6 million from at least 14 investors through the sale of securities issued by three entities he owned and/or controlled. [Dkt. No. 1, ¶¶ 1, 17]. To some investors, Randolph offered and sold stock issued by Randolph Acquisitions, Inc. ("RAI"). [*Id.,* ¶¶ 3-4]. To other investors, Randolph sold interests in Gallagher Management and/or the Gallagher Fund, LP (the "Gallagher Fund"). [*Id.,* ¶¶ 5].

Randolph provided potential RAI investors with audited financial statements, knowing that those financial statements materially overstated the entity's assets. [Dkt. No. 1, ¶¶ 18-36]. Randolph also told potential RAI investors that that RAI owned a company that made a revolutionary building material and that it was preparing to build factories in the United States and U.S. Virgin Islands

2

to manufacture the product. [*Id.,* ¶ 38]. In fact, RAI owned no such company. [*Id.*]. Randolph further misrepresented that RAI: (a) was close to securing a variety of large public and private contracts in the U.S. Virgin Islands; (b) was publicly traded on the pink sheets; (c) was preparing for an imminent IPO, after which pre-IPO shares would be worth much more than their purchase price; (d) was valued at more than $30 million; (e) had, along with its "sister companies," managed over $1.2 billion in assets over the last 15 years, including real estate for universities, hospitals, and wealthy individuals; and (f) significantly outperformed the S&P 500 over the previous five years [*Id.*, ¶¶ 39-49]. None of these statements was true. [*Id.*, ¶¶42, 47-49].

Randolph gave potential investors in the Gallagher Fund a document that recommended a $300,000 investment and claimed that $200,000 of that amount would be allocated to a specific real estate project, and the remaining $100,000 would be allocated to an "Airport Concessions Project." [Dkt. No. 1, ¶ 59]. Randolph did not disclose that the Gallagher Fund did not have any interest in the specified real estate project or an airport concessions project. [*Id.*, ¶ 60].

In December 2016, Gallagher Management entered into an investor agreement pursuant to which another investor gave $90,000 in exchange for a promise of a 20% return, which, along with the return of principal, was to be paid within 36 months. [Dkt. No. 1, ¶ 66]. The agreement provided that "the Company

3

may use the [investment] for any purpose in connection with its development and sale of [a specific property]." [*Id.*, ¶ 67]. While some of the $90,000 investment may have gone towards the specified project, much of it was misappropriated by Randolph, including over $40,000 in cash withdrawals and transfers to Randolph's personal bank accounts. [*Id.*, ¶ 68].

In total, Randolph raised more than $1.6 million from the various securities offerings. [Dkt. No. 1, ¶ 1]. *See also,* Declaration of Karaz S. Zaki ("Zaki Decl."), ¶ 8. Randolph used approximately $468,000 of these funds for what appears to be business expenses. *Id.*, ¶9. He used more than $1.1 million for expenses that do not appear to have been for business. *Id.* For example, Randolph withdrew $355,619 in cash from the RAI investment proceeds and made approximately $137,700 in personal purchases and payments directly from RAI accounts, including the payment of tens of thousands of dollars in personal credit card bills. [Dkt. 1, ¶ 53-54]. *See also*, Zaki Decl., ¶ 10. Randolph also used approximately $252,000 of investor money to pay other investors. Zaki Decl, ¶ 10.

## DISCUSSION

### A.   The Investments Sold by Randolph Are Securities

In addition to common shares in RAI, Randolph sold Investor Agreements issued by RAI and Gallagher Management, and limited partnership interests in the Gallagher Fund, all of which are securities. Section 2(a)(1) of the Securities Act

and Section 3(a)(10) of the Exchange Act define a "security" to include, among other things, an "investment contract." In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), the Supreme Court defined an investment contract to include any contract, transaction, or scheme in which a person: (1) invests money; (2) in a common enterprise; and (3) with the expectation of profits to be derived from the efforts of the promoter or a third party.

The first *Howey* factor is satisfied here because the Investor Agreement and limited partnership investors paid money in exchange for those instruments. [Dkt. No. 1, ¶¶ 1, 17,18, 35, 45, 61, 66]. The second factor—common enterprise—has been addressed by courts in terms of both horizontal commonality and vertical commonality. In the Eleventh Circuit, "broad" vertical commonality is accepted, under which a common enterprise exists when "investors are dependent upon the expertise or efforts of the investment promoter for their returns." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005). Here, broad vertical commonality exists because the investors' fortunes were dependent upon the efforts and expertise of Randolph and his entities in using investor funds to profitably develop various real estate projects. [Dkt. 1, ¶¶ 36, 38, 43, 48-49, 59]. The third *Howey* factor is satisfied because investors were not involved in running the business and had no control over how their investment funds were used.

## B. Randolph violated the Anti-Fraud Provisions of the Federal Securities Laws

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates as a fraud or deceit, in connection with the purchase or sale of a security. Similarly, Sections 17(a)(1) and (a)(3) of the Securities Act prohibit any person from, directly or indirectly in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates as a fraud or deceit.

Here, Randolph engaged in a multi-year course of conduct designed to deceive investors and use investor funds in an undisclosed manner. In soliciting investors, Randolph drafted, made, and disseminated material misstatements that grossly overstated his entities' financial positions, business prospects, and prior successes. [Dkt. No. 1, ¶¶ 21-23, 37-42]. Randolph also misrepresented his own professional background and financial history. [*Id.*, ¶¶ 43-44, 49]. Moreover, Randolph fabricated documents, which greatly overstated Gallagher Management's assets, to provide to Gallagher Management's putative auditor. [*Id.*, ¶¶ 18-34]. To bolster investor confidence, Randolph filed Gallagher Management's false financial statements with the SEC and pointed investors to RAI's SEC filings to lend an additional air of credibility to RAI. [*Id.*, ¶ 36].

6

Finally, Randolph routinely misled investors regarding the intended use of investment proceeds and misappropriated a substantial amount of investor proceeds for his own personal use and the use of his other entities. [*Id.*, ¶¶ 51-54, 63-64, 68].

### C. The Court Should Order Disgorgement and Prejudgment Interest but Deem Those Obligations Satisfied.

A district court has broad equitable powers to order appropriate remedies, including ordering defendants to disgorge their ill-gotten gains, where it has found securities law violations. *SEC v. Monterosso,* 756 F.3d 1326, 1337 (11th Cir. 2014), citing *SEC v. Yun*, 327 F.3d 1263, 1269 n.10 (11th Cir. 2003). Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] authorizes the Commission to seek, and district courts to order, "any equitable relief that may be appropriate or necessary for the benefit of investors."

In *Liu v. SEC*, 140 S. Ct. 1936 (2020), the Supreme Court affirmed the Commission's long-standing ability to seek disgorgement as an equitable remedy, ruling that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Id.* at 1940. The Court may also award disgorgement under Sections 21(d)(3)(A)(ii) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)(ii), (d)(7)] as added by the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (the "NDAA"), Pub. L. 116-283, § 6501.

Under longstanding precedent, the Commission need only show a "reasonable approximation" of the amount of a defendant's ill-gotten gains for purposes of disgorgement. *See, e.g., ETS Payphones*, 408 F.3d at 735. Further, "[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2010), quoting *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998). The Eleventh Circuit has "reaffirmed" that standard after *Liu*. *CFTC v. Tayeh*, 848 F. Appx. 827, 828-29 (11th Cir. 2021) (per curiam) (quoting same language from *Calvo* and, after discussing *Liu*, finding no abuse of discretion "because the CFTC had provided a reasonable approximation of the defendant's ill-gotten gains").

Consistent with *Liu,* and as the CFTC did in *Tayeh*, the Commission has calculated Randolph's "net profits" from the various securities offerings to be $1,110,260.86, representing the $1.6 million total raised less expenses of approximately $468,000, consisting of payroll, consulting, real estate and other business expenses that Randolph's entities paid to third parties. *See* Zaki Decl., ¶¶ 9-10. The Court should thus order Randolph to pay this amount in disgorgement.

The prior judgment entered by the Court also provided that Randolph would pay prejudgment interest on whatever disgorgement was ordered. [Dkt. No. 7, ¶ V]. *See also SEC v. Merchant Capital, LLC*, 486 F. Appx. 93, 97 (11th Cir. 2015)

(affirming imposition of prejudgment interest; "[w]ithout prejudgment interest, the appellants would have benefitted from what in effect amounted to interest-free loans of the ill-gotten funds").  The Commission has calculated that the prejudgment interest on the disgorgement is $175,248.40.  Zaki Decl. at ¶ 11.  To so calculate, Ms. Zaki used the Commission's prejudgment interest calculator, which applies the "interest rate used by Internal Revenue Service for unpaid balances, which changes quarterly." *SEC v. Ahmed*, 2021 WL 2471526, * 6 (D. Conn. June 16, 2021).  Courts in this Circuit regularly apply this rate in calculating prejudgment interest on disgorgement awards.  *See SEC v. Lauer*, 478 F. App'x 550, 557–58 (11th Cir. 2012) (noting the widespread use of the IRS underpayment rate and holding that the district court did not abuse its discretion in applying this "commonly used" rate).  The Court should thus order to pay that amount in addition to disgorgement.

The disgorgement that the Commission seeks is less than the amount this Court ordered Randolph to pay as restitution in the parallel criminal matter in August 2021, less various expenses.  *United States v. Randolph*, Case No. 1:21-cr-00118-SDG (N.D. Ga.), Dkt. No. 22 at 6.  Because the restitution order is based on the same conduct (and ill-gotten proceeds) that underlie this action, the Commission requests that the Court deem Randolph's obligation to pay disgorgement and prejudgment interest satisfied by the restitution order.

Lastly, the Commission notes that this Court sentenced Randolph to 78 months of incarceration in the parallel criminal action. *United States v. Randolph*, Case No. 1:21-cr-00118-SDG (N.D. Ga.), Dkt. No. 22 at 2. Because the criminal case was based on the same conduct at issue in this litigation, and the sentence of incarceration sufficiently penalizes Randolph for this conduct, the Commission does not seek any civil penalties in this matter.

## **CONCLUSION**

For the reasons stated herein, the Court should enter a Final Judgment in the form submitted herewith that (a) renews the injunctive relief previously ordered and (b) orders Randolph to pay disgorgement of $1,110,260.86, plus prejudgment interest of $175,248.40, for a total of $1,285,509.26, but deems that obligation satisfied by the restitution order of $1,602,200 entered against Randolph in the parallel criminal case styled *United States v. Randolph*, No. 1:21-cr-00118-SDG (N.D. Ga.).

Dated: February 26, 2025[1]

---

[1] Pursuant to Local Rule 7.1D, counsel for the Commission certifies that this Motion to Amend Judgment has been prepared in 14-point Times New Roman font, which is approved by the Court in LR 5.1B.

Respectfully submitted,

*s/W. Shawn Murnahan*
W. Shawn Murnahan
Senior Trial Counsel
Georgia Bar No. 529940
Email: murnahanw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Email: loomism@sec.gov


Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Atlanta Regional Office
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, Georgia 30326-1382
(404) 842-7600

## CERTIFICATE OF SERVICE

      On February 26, 2024, I electronically filed the foregoing Motion for Entry of Consent Judgment with the Office of the Clerk, using the CM/ECF system. Notification of this filing will be served electronically by the Clerk on counsel who have registered in the CM/ECF system.

                                          *s/W. Shawn Murnahan*
                                          W. Shawn Murnahan
                                          Senior Trial Counsel